## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| **PHILIP J. TRIDICO,**<br><br>               **Plaintiff,**<br><br>**v.**<br><br>**DISTRICT OF COLUMBIA,**<br><br>               **Defendant.** | **Civil Action No. 13-0937 (ESH)** |

## <u>MEMORANDUM OPINION</u>

Plaintiff Officer Philip J. Tridico brings this action against the District of Columbia alleging that he has been, and continues to be, subjected to discrimination, retaliation, and a hostile work environment based on his religion and past military service. (*See* Compl., June 21, 2013 [ECF No. 1].)  Defendant now moves for summary judgment.  (Def.'s Mot. for S. J. and to Dismiss, May 18, 2015 [ECF No. 26] ("Mot.").)  For the following reasons, the motion is granted in part and denied in part.

## BACKGROUND

Plaintiff, a Roman Catholic, served in the United States Marine Corps and the Marine Corps Reserves as a Corporal from 1992 until 1999, when he was honorably discharged.  (*See* Pl.'s St. of Mat. Facts in Dispute, June 22, 2014 [ECF No. 29] at 1.)  He has been employed by the Metropolitan Police Department ("MPD") in the District of Columbia since 2006.  (*See* Pl.'s St. of Mat. Facts in Dispute, Ex. 2, June 22, 2014 [ECF No. 29-2] ("Pl. Dep. Tr.") at 23.) Plaintiff was assigned to the Crime Patrol Unit until 2008, when he was transferred to the Auto Theft Unit.  (*See id.* at 24.)  In January 2009, plaintiff was assigned to the Sixth District

Narcotics Unit ("Narcotics") where he was supervised by Sergeant Matthew Nickerson and Sergeant Ernest Grant, under Lieutenant Gary Fitzgerald's and Captain Keith Deville's chain of command.  (*See* Compl. ¶¶ 19-20; Pl. Dep. Tr. at 30.)

Soon after plaintiff arrived in Narcotics in early 2009, he approached Lieutenant Fitzgerald about his concern with other officers, including Officer Samoli Fuller, calling plaintiff a "White Boy," the frequent use of the "N-word" by officers, and the display of pornography in the workplace.  (*See* Pl. Dep. Tr. at 31-33.)  Three or four days later, plaintiff heard from another officer that Officer Fuller was under investigation for the behavior that plaintiff had reported.  (*See id.* at 32.)  Officer Fuller was either terminated or resigned shortly thereafter.  (*See id.* at 35-36.)  Following these events, Sergeant Nickerson began to call plaintiff "moral" and "sensitive."  Plaintiff alleges that he was labeled moral because of his objection to pornography, which he believes Sergeant Nickerson attributed to plaintiff's religion.  (*See id.* at 33.)

In the summer of 2009, plaintiff crossed himself before eating his lunch.  (*See id.* at 37.)  Witnessing plaintiff's gesture, Sergeant Nickerson pointed at plaintiff and declared, "[T]hat is why he is so weird, he believes in that weirdo Jesus shit."  (*See id.*)  Following this interaction, Sergeant Nickerson repeatedly referred to plaintiff as "weirdo," so often that plaintiff does not recall Sergeant Nickerson using his name at any point thereafter.  (*See id.*)  On another occasion, plaintiff came to the office wearing a sweater after appearing in court and attending church.  Upon seeing plaintiff and learning that plaintiff had attended church, Sergeant Nickerson remarked, "Church! That is a waste of time."  (*Id.* at 55.)  Plaintiff notes that these comments were about his "morals, [his] values, [his] upbringing, [his] religion."  (*Id.* at 57.)

Plaintiff alleges that the "daily harassment and discrimination" he endured also related to his prior military service.  (Pl.'s Opp. to Mot., June 22, 2015 [ECF No. 30] ("Opp.") at 4.)

Sergeant Nickerson repeatedly told other officers in Narcotics that plaintiff was "crazy," suffered from post-traumatic stress disorder ("PTSD"), was a "PTSD motherfucker," heard "voices in his head," and could "go off at any time." (Pl. Dep. Tr. at 37-38.) Sergeant Nickerson frequently referred to plaintiff as a "retard," "psycho," and "killer." (*Id.* at 37-38, 54.) In July 2010, when plaintiff asked Sergeant Nickerson to pass him a knife, Sergeant Nickerson responded, "I'll pass you the knife, you kill yourself . . . [Y]ou are not good for anything anyway." (*Id.* at 62.) On another occasion, plaintiff asked Sergeant Nickerson for information regarding confiscated property, and Sergeant Nickerson responded, "What's the voices in your head say you PTSD motherfucker." (*Id.* at 58.)

Plaintiff acknowledged that Sergeant Nickerson was "the only one that gave [him] those comments" and "when [Sergeant Nickerson] wasn't there, he wasn't at work, [plaintiff] had peace because nobody else would say it." (*Id.* at 64.) However, Officer Victoria Gibson, an officer with whom plaintiff previously had a romantic relationship, also engaged in harassing behavior. (*See id.* at 45.) In early 2010, Officer Gibson printed pictures and posted them above the community desk where plaintiff regularly worked. (*See id.* at 47.) One of the pictures depicted Pope John Paul II with the word "weirdo" handwritten on it. (*See id.*) Alongside the picture of the Pope, Officer Gibson had also posted a picture of a United States marine holding a rifle with the word "killer" handwritten on the photo. (*See id*.) The pictures, posted near a communal printer, were highly visible to plaintiff and his coworkers. (*See id.*) Lieutenant Fitzgerald was nearby when several officers were laughing at the pictures, and he "kind of chuckled and walked away." (*Id.* at 80.) The offensive photographs remained posted on the community desk for several months and were only removed to prepare for an office inspection by the Internal Affairs Division. (*See id.* at 79.)

3

At one point, plaintiff asked Sergeant Nickerson to refrain from calling him names.  (*See* Pl. Dep. Tr. at 56-57.)  Sergeant Nickerson responded that he was a sergeant and plaintiff could not talk to him that way.  He also told plaintiff that "you know I'm just going to fuck with you." (*Id.* at 57.)  Plaintiff spoke with Sergeant Grant between May 2010 and August 2010 about Sergeant Nickerson's comments.  (*See id.* at 64.)  Sergeant Grant advised plaintiff that he was "just internalizing it, just let it go."  (*Id.* at 65.)  Plaintiff alleges that he was not able to let it go, and the harassment affected his employment and health.  For example, in July 2010, plaintiff sat in the roll call room and avoided the Narcotics office to "get away from the beating."  (*Id.* at 63.) As a result of the harassment, plaintiff says he still suffers from headaches, nausea, loss of sleep, and anxiety, and regularly attends therapy.  (*See id.* at 85-86.)

Following an instance when Sergeant Nickerson called plaintiff a "fucking retard," plaintiff reported the ongoing harassment to Lieutenant Fitzgerald on August 12, 2010.  (*See id.* at 77.)  Lieutenant Fitzgerald said that he did not know why people disliked plaintiff and suggested that he take annual leave for two days.  (*See id.* at 74.)  On August 13, 2010, plaintiff called Officer Jody Shegan, a union representative, and communicated some of Sergeant Nickerson's comments.  (*See id.* at 75.)  Officer Shegan then informed the Internal Affairs Division of plaintiff's concerns, which upset plaintiff because he was worried about repercussions for complaining.  (*See id.* at 75-76.)  Thereafter, plaintiff received a call from the Internal Affairs Division, and he discussed how he was being treated by Sergeant Nickerson. (*See id.* at 76.)

When plaintiff returned to work on August 17, 2010, he met with Captain Deville, Lieutenant Fitzgerald, and Officer Shegan.  (*See id.* at 96.)  Captain Deville informed plaintiff that the Department would investigate plaintiff's allegations and asked him how he would handle

future incidents of harassment from Sergeant Nickerson.  (*See* Pl. Dep. Tr. at 96, 98.)  When

plaintiff responded that he would write them down and inform Captain Deville, the Captain

"shrugged his shoulders" and said "you are out . . . . you are out of the office."  (*Id.* at 98.)

Plaintiff requested to be transferred to the Narcotics and Special Investigations Division

("NSID"), but instead, he was transferred to the Auto Theft Unit, although he was permitted to

continue to work on some narcotics cases.  (*See id.* at 102, 104.)  Later that day, Captain Deville

again met with plaintiff and asked him if he was going to file an Equal Employment Opportunity

("EEO") complaint.  (*See id.* 100-01.)  Plaintiff responded that he intended to do so.  (*See id.*)

Plaintiff filed an internal EEO complaint with MPD's Internal Affairs Division and EEO

Compliance Branch on August 22, 2010.  (*See* Pl.'s St. of Mat. Facts in Dispute at 9.)

 Plaintiff alleges that in retaliation for complaining in August 2010, Captain Deville

transferred him to the Auto Theft Unit on the same day that he filed his EEO internal complaint.

(*See* Compl. ¶ 51.)  Following the reassignment, plaintiff was under the direct supervision of

Sergeant Drummond, but the rest of the chain of command remained the same.  (*See* Pl. Dep. Tr.

at 104.)  In the Auto Theft Unit, plaintiff participated in fewer search and arrest warrants.  (*See*

*id*. at 187.)  As a result, plaintiff appeared in court less, reducing his overtime pay significantly.

(*See id.* at 188.)  In 2009, plaintiff earned between $75,000 and $80,000, but in 2011, plaintiff

earned only $54,000.  (*See id.*)

 In the Auto Theft Unit, plaintiff no longer interacted frequently with Sergeant Nickerson,

but he nonetheless alleges that he was still retaliated against in numerous ways for his EEO

complaint.  (*See id.* at 103.)  Specifically, he was required to wear a uniform even though he had

previously been allowed to work in plain clothes.  (*See id.*)  He was also directed to drive a

marked scout car instead of an unmarked car.  (*See id.*)  When plaintiff was allowed to drive an

unmarked car, his vehicle lacked police lights or sirens.  (*See id.* at 128.)  Plaintiff was not

provided with a laptop for his vehicle even though some vehicles were equipped with two

laptops if two officers rode together.  (*See* Pl.'s Dep. Tr. at 129.)  Plaintiff alleges that he was

assigned responsibilities below his seniority level, and his supervisors and fellow officers

declined to inform him about assignments, Unit schedules, and search warrants.  (*See id.* at 134-

37.)  Plaintiff participated in the Robbery Intervention Program, but when the program was

temporarily suspended, plaintiff was not permitted to resume his detail because of what one

sergeant described as plaintiff's "administrative issues."  (*Id.* at 141-42.)   Plaintiff was

eventually transferred to the Crime Patrol Unit where he currently works under the supervision

of Sergeant Williams, Captain Carrol, and Commander Contee.  Plaintiff claims this was a

demotion. (*See* Compl. ¶ 56.)

On March 11, 2011, plaintiff filed a discrimination claim against MPD with the D.C.

Office of Human Rights ("DCOHR") alleging that he was subjected to a hostile work

environment on account of his religion and retaliation.  (*See* Pl.'s St. of Mat. Facts in Dispute at

9.)  The DCOHR determined that there was probable cause to believe that the District had

subjected plaintiff to a hostile work environment because of his religion, but that there was no

probable cause to support his retaliation claim.  (*See id.* at 10.)

In his complaint, plaintiff alleges that defendant subjected him to discrimination and a

hostile work environment because of his religion in violation of Title VII of the Civil Rights Act,

42 U.S.C. §§ 2000e, *et seq.*, and his prior military service in violation of the Uniformed Services

Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. §§ 4301, *et seq.*  Plaintiff

also alleges that defendant retaliated against him for his protected activity and is liable for

negligently retaining and supervising Sergeant Nickerson.  Finally, plaintiff has brought

discrimination, hostile work environment, and retaliation claims under the District of Columbia Human Rights Act, D.C. Code §§ 2-1401, *et seq.*, but has now dismissed those claims. (*See* Opp. at 9 n.2.)

In its motion for summary judgment, defendant argues that plaintiff (1) failed to exhaust his administrative remedies with respect to his Title VII discrimination and retaliation claims; (2) cannot prove a *prima facie* case for discrimination based on military service; (3) cannot prove a hostile work environment under Title VII; (4) cannot bring a hostile work environment claim under USERRA; (5) cannot prove a *prima facie* case for retaliation under Title VII and has not stated a claim for retaliation under USERRA; and (6) is precluded from bringing his negligence claim because it is preempted by Title VII.

## ANALYSIS

### I.   STANDARD OF REVIEW

Under Federal Civil Rule of Procedure 56, a motion for summary judgment shall be granted if the pleadings, discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "A genuine issue of material fact exists if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the non-moving party." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014) (quoting *Hampton v. Vilsack*, 685 F.3d 1096, 1099 (D.C. Cir. 2012)) (internal citation marks omitted). A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986)).

In considering a motion for summary judgment, the "evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

The non-moving party's opposition, however, must consist of more than mere unsupported

allegations or denials and must be supported by affidavits or other competent evidence setting

forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e).

## II.     FAILURE TO EXHAUST

Defendant contends that plaintiff failed to exhaust his administrative remedies, as

required by Title VII, with respect to his discrimination claim and certain retaliatory actions.

(*See* Mot. at 6.)  The EEOC has "established detailed procedures for the administrative resolution

of discrimination complaints" which "[c]omplainants must timely exhaust . . . before bringing

their claims to court." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997).  Further, a

"Title VII lawsuit following the EEOC charge is limited in scope to claims that are 'like or

reasonably related to the allegations of the charge and growing out of such allegations.'" *Park v.*

*Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (quoting *Cheek v. W. & S. Life Ins. Co.*, 31

F.3d 497, 500 (7th Cir. 1994)).  "At a minimum, the Title VII claims must arise from 'the

administrative investigation that can reasonably be expected to follow the charge of

discrimination.'" *Park*, 71 F.3d at 907.  The burden falls on defendant to prove by a

preponderance of the evidence that plaintiff failed to exhaust administrative remedies. *See*

*Na'im v. Rice*, 577 F. Supp. 2d 361, 370 (D.D.C. 1008) (citing *Brown v. Marsh*, 777 F.2d 8, 13

(D.C. Cir. 1985)).

### a.   **Title VII Discrimination Claim**

Defendant argues that plaintiff's Title VII discrimination claim is "completely different" from the charges he brought before the EEOC.  Specifically, defendant argues that plaintiff alleged before the EEOC "that he was harassed based on, among various other things, his religion," but neglected to specify that he was transferred to the Auto Theft Unit because he is Catholic.  (Mot. at 6-7.)  Further, because plaintiff noted that he was transferred in retaliation for complaining about Sergeant Nickerson's comments, "the inference that he was transferred because of his religion did not arise from any administrative investigation." (*Id*. at 7.)  Plaintiff responds that notwithstanding the fact that he organized his EEOC charges under the headings "Hostile Work Environment" and "Retaliation" (Mot., Ex. 1, Charge of Discrimination Form [ECF No. 26-1] ("EEOC Charge") at 1), he adequately alleged that he suffered an adverse action that was motivated by religious animus.  (*See* Opp. at 10.)

The Court agrees that plaintiff need not have included a specific "Discrimination" heading in his EEOC charges in order to exhaust this claim.  *See Wiley v. Glassman*, 511 F.3d 151, 160 (D.C. Cir. 2007) (failure to specifically list retaliation claim in formal administrative complaint did not undermine exhaustion).  Rather, the substance of the Title VII claim must be within the overall scope of "the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Marshall v. Fed. Exp. Corp.*, 130 F.3d 1095, 1098 (D.C. Cir. 1997) (quoting *Park*, 71 F.3d at 907).  Plaintiff's administrative charges describe a series of religiously offensive comments made by one of his supervisors followed by an adverse employment action (*i.e.*, the transfer to the Auto Theft Unit).  (*See* EEOC Charge at 1-2.)  Plaintiff also stated in the EEOC complaint that he "charge[s] Respondent with unlawful discriminatory acts in violation of Title VII of the Civil Rights Act."  (*Id.*)  Based on these facts,

the Court concludes that the allegations plaintiff included in his EEOC complaint were sufficient to trigger an investigation into whether plaintiff suffered an adverse action because of his religion.  Thus, plaintiff exhausted his administrative remedies with respect to his Title VII religious discrimination claim.

### b.  Title VII Retaliation Claim

Defendant also argues that plaintiff's retaliation claim is limited to his reassignment to the Auto Theft Unit, which is the only adverse action alleged in the EEOC charge, since the other adverse employment actions alleged in the complaint were not included in the EEOC charge.  (*See* Mot. at 7-8 (citing Compl. ¶ 56).)  Plaintiff responds that "exhaustion is not required for discrete acts of retaliation as long as the acts fall within the statutory period and are like or related to the administrative allegations."  (Opp. at 11-12 (citing *Contreras v. Ridge*, 305 F. Supp. 2d 126, 135 (D.D.C. 2004).)

"The administrative charge requirement serves the important purposes of giving the charged party notice of the claim and 'narrow[ing] the issues for prompt adjudication and decision.'" *Park*, 71 F.3d at 907 (quoting *Laffey v. NW Airlines, Inc.*, 567 F.2d 429, 472 n.325 (D.C. Cir. 1976)).  To achieve this purpose, "[n]aturally every detail of the eventual complaint need not be presaged in the EEOC filing, but the substance of . . . a Title VII claim [ ] must fall within the scope of 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Marshall*, 130 F.3d at 1098 (quoting *Park*, 71 F.3d at 907).

Plaintiff's EEOC charge alleges that he was transferred to the Auto Theft Unit in retaliation for his internal complaint.  (*See* EEOC Charge at 1-2.)  The additional retaliatory acts enumerated in the complaint resulted from his transfer.  (*See* Compl. ¶ 56.)  For example, plaintiff alleges that following his transfer, he was the only officer required to wear a police

10

uniform, relegated to a marked police car instead of an unmarked cruiser, denied a police laptop, and assigned responsibilities below his seniority.  (*See id.*)  These allegations grew out of the adverse action included in the EEOC charge, and it is reasonable to assume that the EEOC's investigation would have addressed the consequences of plaintiff's transfer.  Therefore, the Court concludes that defendant has not met its burden of proving that these retaliatory acts were not exhausted.

## III.   DISCRIMINATION[1]

Under USERRA, "[a] person who is a member of . . . or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership."  38 U.S.C. § 4311(a).  USERRA also provides that "[a]n employer shall be considered to have engaged in actions prohibited . . . under subsection (a), if the person's membership . . . is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership."  38 U.S.C. § 4311(c).

An employee who brings a discrimination claim under USERRA must show by a preponderance of the evidence that his membership in the uniformed services was a substantial or motivating factor in the adverse employment action.  *See Potts v. Howard Univ. Hosp.*, 843 F. Supp. 2d 101, 104 (D.D.C. 2012).  "If the employee successfully makes that prima facie

---

[1] In its motion for summary judgment, defendant relies only on its exhaustion arguments to justify dismissal of plaintiff's Title VII discrimination claim.  In its reply, however, defendant argues for the first time that plaintiff has failed to show that he suffered an adverse action motivated by religious discrimination.  (*See* Reply, July 17, 2015 [ECF No. 34] at 5-7.)  In considering a motion for summary judgment, it is within the Court's discretion to ignore the movant's arguments made in the first instance in its reply.  See *U.S. ex rel Purcell v. MWI Corp.*, 520 F. Supp. 2d 158, 166 (D.D.C. 2007).  The Court will therefore not address the arguments raised for the first time in defendant's reply.

showing, the employer can avoid liability by demonstrating that it would have taken the same action anyway for a valid reason, without regard to the employee's military service." *Id.* (citing *Erickson v. U.S. Postal Serv.*, 571 F.3d 1364, 1368 (Fed. Cir. 2009)).

Defendant argues that plaintiff cannot carry his burden of making a *prima facie* showing that his prior military service was a motivating factor in the decision to transfer him to the Auto Theft Unit. Defendant does not contest plaintiff's allegations that he served in the military or that the transfer to the Auto Theft Unit was an adverse employment action (*see* Opp. at 15), so the only issue is whether plaintiff's prior military service was a motivating factor in the employer's adverse action.

Plaintiff contends that defendant misstates the record and that the evidence shows that defendant took into account plaintiff's military service when deciding to transfer him. However, the events that plaintiff relies upon are examples of harassment by Sergeant Nickerson and Officer Gibson. (*See* Opp. at 15-16.) Indeed, plaintiff cites evidence that Sergeant Nickerson expressed animus toward plaintiff because of his prior military service, but he does not show that these actions were causal factors underlying Captain Deville's decision to transfer plaintiff. According to plaintiff's deposition, only Lieutenant Fitzgerald, Captain Deville, and Officer Shegan, the union representative, were present at the August 17, 2010 meeting in which plaintiff was informed he would be transferred out of Narcotics. (*See* Pl. Dep. Tr. at 96.) Not only was Sergeant Nickerson not present at the meeting, but there is no evidence that he submitted a report, written or verbal, to Lieutenant Fitzgerald or Captain Deville regarding plaintiff that may have influenced the employment action. In fact, there is no evidence that the individuals who made the decision to transfer plaintiff had any contact with Sergeant Nickerson before transferring plaintiff.

12

Without any evidence that Sergeant Nickerson intended to cause, and did in fact cause, the adverse employment action, plaintiff cannot meet his burden.  For example, in *Staub v. Proctor Hosp.*, the plaintiff's immediate supervisors included negative entries in his personnel file out of hostility toward his military obligations with the intention that he would be fired.  562 U.S. 411, 414 (2011).  There was no evidence that the individual who eventually terminated the plaintiff harbored any such hostility, but the Supreme Court held that the defendant was liable because the discriminatory acts of the plaintiff's supervisors *caused* the adverse action.  *See id.* at 423.  The Court noted that the termination notice expressly stated that the plaintiff was fired because of the negative reports in his personnel file and that the two supervisors had the specific intent to cause the plaintiff to be terminated.  *See id.*  By contrast, "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . , then the employer will not be liable."  *Id.* at 421.  Here, plaintiff has not identified any evidence that Sergeant Nickerson, or any others who expressed discriminatory animus, "intended to cause, and did in fact cause, an adverse employment decision."  *Id*.

Plaintiff also asserts that he "endured disparate treatment and discriminatory statements and actions" by Sergeant Drummond and Captain Deville, but he does not present any evidence to support the contention that these supervisors discriminated against him on the basis of his military service.  (Opp. at 16-17.)  "Circumstantial evidence will often be a factor in [USERRA] cases, for discrimination is seldom open or notorious," but plaintiff does not provide even circumstantial evidence that the transfer decision was motivated by his prior military service.  *Sheehan v. Dep't of Navy*, 240 F.3d 1009, 1014 (Fed. Cir. 2001).  Plaintiff points to the deposition testimony of Officers Tridico and Tabitha Alberti to "demonstrate numerous instances of disparate treatment concerning Officer Tridico," but neither officer testified that Sergeant

Drummond or Captain Deville treated plaintiff negatively because of his military service.  (Opp.

at 17.)  In fact, the only reason plaintiff and Officer Alberti cite to explain the treatment at the

hands of Sergeant Drummond and Captain Deville is that plaintiff engaged in protected activity

by complaining about the discriminatory behavior of others.  (*See* Pl. Dep. Tr. at 98, 187; Pl.'s

St. of Mat. Facts in Dispute, Ex. 3, June 22, 2015 [ECF No. 29-3] ("Alberti Tr.") at 38, 114.)

Without evidence that plaintiff's military service was a factor in the alleged disparate treatment,

plaintiff has not met his burden under USERRA to support a discrimination claim.  *See Sheehan*,

240 F.3d at 1015 ("[C]laimants must show evidence of discrimination other than the fact of non-

selection and membership in the protected class.").  Thus, the discrimination claim in Count III is

dismissed.

## IV.    RETALIATION

### a.  Based on Religion

Under Title VII, it is unlawful for an employer to "discriminate against any of his

employees . . . because he has made a charge, testified, assisted, or participated in any manner in

an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To

succeed in a retaliation claim, plaintiff must prove "(1) that he engaged in statutorily protected

activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal

link connects the two."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  A "materially

adverse action" is an action that "well might have 'dissuaded a reasonable worker from making

or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S.

53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  To meet the

causal nexus prong, the plaintiff "must demonstrate by direct or circumstantial evidence that the

employer had actual knowledge of the protected activity and took adverse action against him

because of it." *Sledge v. Dist. of Columbia*, 63 F. Supp. 3d 1, 19 (D.D.C. 2014); *see also Univ. of Tex. Southwestern Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2533 (2013) ("Title VII retaliation claims must be proved according to traditional principles of but-for causation.").

Retaliation claims are subject to the *McDonnell* burden-shifting framework wherein the plaintiff must first make a *prima facie* case of retaliation. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). This showing triggers the employer's burden to show a legitimate, non-retaliatory reason for the alleged adverse action. *Allen v. Johnson*, No. 13-5170, 2015 WL 4489510, at *3 (D.C. Cir. Jul. 24, 2015). The plaintiff may overcome this by showing that the proffered non-retaliatory reason was pretextual. *See McDonnell*, 411 U.S. at 804. However, in considering a motion for summary judgment, district courts fast-forward to the final step and examine "whether all of the evidence, taken together, supports an inference of retaliation when the employer has proffered a legitimate, non-discriminatory reason for the adverse action at issue." *Sledge*, 63 F. Supp. 3d at 19; *see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) ("[I]n considering an employer's motion for summary judgment . . . the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the employee on the basis of [his religion]?").

In its motion, defendant does not argue that plaintiff failed to show that he suffered a materially adverse action. In fact, defendant acknowledges that plaintiff's transfer to the Auto Theft Unit may be considered a materially adverse action, asserting that "the Court should limit its review to only Plaintiff's reassignment." (Mot. at 8.) Plaintiff, however, alleges that there were additional retaliatory actions that were materially adverse to him: (1) requirement to wear a

police uniform; (2) requirement to drive a marked police car instead of an unmarked car; (3) when he was afforded an unmarked car, it lacked police lights or sirens; (4) denied a police laptop; (5) assigned responsibilities below his seniority level; (6) isolated from information, unit schedules, and search warrant executions; (7) severe and hostile treatment by supervisors including further demotion to Crime Patrol; and (8) denied participation in the Robbery Intervention Program.  (*See* Opp. at 12-13.)

Plaintiff has shown that the transfer to the Auto Theft Unit caused him financial harm; the transfer limited his opportunity for overtime, which significantly decreased his annual income from approximately $75,000 to $54,000.  (*See* Pl. Dep. Tr. at 188.)  This employment action is certainly enough to dissuade a reasonable worker from making a charge of discrimination.  However, the other actions plaintiff identifies do not meet the definition of a materially adverse action. [2]  *See Burlington*, 548 U.S. at 68 ("We speak of *material* adversity because we believe it is important to separate significant from trivial harms.  Title VII, we have said, does not set forth 'a general civility code for the American workplace.'") (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998)).  Indeed, "[t]he antiretaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67.  Although plaintiff may have been singled out by certain administrative requirements such as the requirement to wear a police uniform and to drive a

---

[2] Plaintiff alleges that in retaliation for his protected activity, he received "an eventual demotion to Crime Patrol on or about January 2, 2013."  (Compl. ¶ 56(g).)  Although plaintiff alleges in his complaint that his transfer to Crime Patrol was a demotion, he admits that "it is not an undesirable position" and "just means . . . back in uniform."  (Pl. Dep. Tr. at 143-42.)  Nor does he allege that he suffered any financial consequences as a result of the transfer to Crime Patrol.  Further, the transfer to Crime Patrol occurred three years after he filed the internal EEO complaint and nearly two years after he filed an EEOC charge with the DCOHR.  Thus, the transfer to Crime Patrol cannot be swept into plaintiff's claim of retaliation.  *See Rochon*, 438 F.3d at 1219.

marked police vehicle while on duty, these requirements are not enough to dissuade a reasonable worker from making or supporting a charge of discrimination. Thus, only the transfer to the Auto Theft Unit will be considered an adverse action for purposes of retaliation.

Defendant argues that Captain Deville, the supervisor responsible for transferring plaintiff, was not aware that plaintiff was planning on filing an EEO complaint until after the decision to transfer him. (*See* Reply at 9 ("It was after Tridico learned of the [transfer] decision that he informed Captain DeVille that he would be filing an EEO complaint, which he did on August 22, 2010.").)  There is a factual dispute, however, as to this issue.  According to plaintiff, he informed Captain Deville that he intended to file an EEO complaint following the meeting on August 17, 2010. (*See* Pl. Dep. Tr. at 100 ("[Captain Deville] sat there . . . and he goes you are really going to file a EEO Complaint?  And I was like absolutely Captain.").)  Defendant further contends that plaintiff was reassigned to the Auto Theft Unit "only after he asked for a transfer, and [plaintiff's supervisors] laterally transferred him away from an allegedly unpleasant environment to a unit with a known supervisor." (Mot. at 17.)  While plaintiff admits that he asked for a transfer to NSID (*see* Pl. Dep. Tr. at 104 (plaintiff "asked to go to NSID.")), he argues that this defense is merely pretextual and that he "never asked to be transferred to the Auto Theft Unit because such a reassignment was contrary to his career goals.  Rather, Officer Tridico requested that the discriminating officers and supervisors be dealt with and that he be given a fair opportunity to pursue drug crimes in NSID." (Pl.'s St. of Mat. Facts in Dispute at 4.)

Moreover, during the August 17, 2010 meeting, Captain Deville asked plaintiff what he would do if the harassment occurrences with Sergeant Nickerson happened again. (*See* Pl. Dep. Tr. at 98.)  When plaintiff responded that he would write them down and deliver his notes to Captain Deville, the captain "shrugged his shoulders" and said "you are out . . . . you are out of

the office."  (*Id.*)  Indeed, defendant admits that the "reason [Captain Deville] was transferring

him was that he complained excessively and created too much animosity in the unit to continue

working there."  (Reply at 10.)

Plaintiff contends that the timing of the transfer and the comments of his colleagues also

support his position that he was reassigned because of his informal complaints to his supervisors

and the internal EEO complaint.  (*See* Opp. at 24-25.)  Plaintiff informally complained to his

supervisors regarding the alleged harassment on August 17, 2010, and was transferred to the

Auto Theft Unit on August 22, 2010—the same day that he filed an internal EEO complaint.

(*See id.* at 24.)  "The temporal proximity of an adverse action close on the heels of protected

activity is a common and highly probative type of circumstantial evidence of retaliation."  *Allen*,

2015 WL 4489510, at *3.

Plaintiff has also provided evidence that there was an assumption in the Unit that

complaining would lead to an adverse employment action.  He testified in his deposition that he

was fearful of reporting Sergeant Nickerson's actions and comments to the Internal Affairs

Division "[b]ecause [he] knew if [he] reported it, [he] was done."  (Pl. Dep. Tr. at 135.)

Similarly, Officer Alberti testified in her deposition that "trouble-makers," which she said may

include officers who engage in protected activity, "get moved out of the unit or [ ] get transferred

or get written up."  (Alberti Dep. Tr. at 38.)

Taken together and giving plaintiff the benefit of all reasonable inferences, the evidence

is sufficient to permit an inference of retaliation in violation of Title VII.

### b.  Based on Military Service

Under USERRA, "[a]n employer may not discriminate in employment against or take

any adverse employment action against any person because such person . . . has taken an action

to enforce a protection afforded any person under this chapter . . . or has exercised a right provided for in this chapter." 38 U.S.C. § 4311(b). An employer is prohibited from taking an adverse action against a covered employee if the employee's protected activity "is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such person's enforcement action . . . or exercise of a right." 38 U.S.C. § 4311(c).

Defendant first asserts, without legal support, that retaliation is not a separate cause of action under USERRA. (Mot. at 18.) Contrary to defendant's assertion, it has been recognized that retaliation may be brought as a separate cause of action under USERRA. *See Brandsasse v. City of Suffolk, Va.*, 72 F. Supp. 2d 608, 612 (E.D. Va. 1999) (describing discrimination and retaliation as two separate causes of action under USERRA). Defendant also argues that even if retaliation can be brought as a separate cause of action, plaintiff has failed to state a claim of retaliation under USERRA because he has not shown that he took an action to enforce a protection or right provided by the statute. (*See* Mot. at 18.) Specifically, plaintiff complained to his supervisors about alleged derogatory comments regarding his prior military service, and as argued by defendant, USERRA does not protect an employee from derogatory comments or harassment in the workplace. (*See id.* at 19.) As discussed in Section V(b), *infra*, the Court concludes that USERRA recognizes a hostile work environment claim. Thus, plaintiff engaged in a protected activity under USERRA when he complained that his right to be free from a hostile work environment had been violated, and to the extent that Count III alleges retaliation based on USERRA, it survives summary judgment.[3]

---

[3] In its motion for summary judgment, defendant does not challenge the other elements of plaintiff's USERRA retaliation claim.

V.      **HOSTILE WORK ENVIRONMENT**

   a.  **Based on Religion**

Defendant argues that plaintiff has failed to show that the alleged religious harassment

was severe or pervasive, since it claims that it is undisputed that plaintiff's coworkers only

commented on his religion twice.  (*See* Mot. at 11.)  Plaintiff vigorously disputes this statement

and offers ample evidence that his coworkers engaged in "an ongoing pattern of daily

discriminatory and harassing remarks" regarding his religion.  (Opp. at 19.)

   "A hostile work environment claim is composed of a series of separate acts that

collectively constitute one unlawful employment practice." *Nat'l R.R. Passenger Corp. v.*

*Morgan*, 536 U.S. 101, 117 (2002) (internal quotation marks omitted).  A work environment is

considered "hostile" under Title VII only when it is "permeated with discriminatory intimidation,

ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." *Oncale*, 523 U.S. at 78 (quoting

*Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks omitted)).

   To determine whether a work environment is sufficiently "hostile" to support a Title VII

claim, the Court must look at the totality of the circumstances, including "the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interferes with an employee's work

performance." *Harris*, 510 U.S. at 23; *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1201

(D.C. Cir. 2008).  The "conduct must be extreme to amount to a change in the terms and

conditions of employment." *Faragher v. Boca Raton*, 524 U.S. 775, 788 (1998).  "[O]ffhand

comments [ ] and isolated incidents (unless extremely serious)" do not meet this standard. *Id.*

Contrary to defendant's argument, plaintiff has provided evidence that supports his allegation that he was subjected to a daily barrage of harassing and discriminatory remarks regarding his religion. Between the summer of 2009 and the time he was transferred to the Auto Theft Unit in August 2010, Sergeant Nickerson called plaintiff "weirdo" so often that plaintiff was not called "Joe or Philip or Tridico ever again." (*See* Pl. Dep. Tr. at 37.) Although the term "weirdo" on its face does not necessarily connote religious animus, plaintiff provided evidence that Sergeant Nickerson and others employed this term to denigrate plaintiff's religious beliefs. For example, upon viewing plaintiff crossing himself, Sergeant Nickerson said, "[T]hat is why he is so weird, he believes in that weirdo Jesus shit." (*See id.*) The connection between "weirdo" and plaintiff's religion is also evident by the photograph of the Pope transcribed with the word "weirdo" that Officer Gibson posted in plaintiff's workspace. (*See id.* at 47.)

Plaintiff has also demonstrated a genuine issue of material fact that the alleged harassment altered the conditions of his employment. In July 2010, plaintiff sat in the roll call room and avoided the Narcotics office to "get away from the beating." (*Id.* at 63.) He testified that as a result of the harassment, he still suffers from headaches, nausea, loss of sleep, and anxiety. (*See id.* at 85.) Plaintiff has sought therapy "to talk about work and work related stress due to [his] ability to practice [his] religion." (*Id.* at 86.) Thus, given this evidence, a reasonable jury could find that the harassing comments were pervasive and altered the conditions of his employment.

### b.   Based on Military Service

Defendant argues that USERRA did not include a cause of action for hostile work environment in 2010. (*See* Mot. at 13.) Defendant relies on *Carder v. Cont'l Airlines, Inc.*, in which the Fifth Circuit "decline[d] to infer a cause of action for hostile work environment under

21

USERRA," because it did not include the "terms, conditions, or privileges of employment"
language that has been construed to allow hostile work environment claims under Title VII.  636
F.3d 172, 179 (5th Cir. 2010).  In 2011, only eight months after the Fifth Circuit issued its
decision in *Carder*, Congress amended USERRA to add that "benefit[s] of employment" include
"terms, conditions or privileges of employment."  38 U.S.C. § 4303(2) (2011).  Defendant argues
this amendment is not retroactive, and thus, does not apply to plaintiff's claim because the
harassment ceased in August 2010.  However, numerous courts have held that the amendment,
deemed by Congress as a "clarification of benefits of employment covered under USERRA," is
retroactive.[4]  *See Montoya v. Orange County Sheriff's Dept.*, 987 F. Supp. 2d 981, 1012-15 (C.D.
Cal. 2013) ("[T]he Court defers to Congress's opinion that the 2011 Amendment was intended to
clarify, not change the scope of USERRA, and thus hostile work environment claims have
always been cognizable under USERRA."); *McDaniel v. Loyola Univ. Med. Ctr.*, No. 13-6500,
2014 WL 4269126, at *7 (N.D. Ill. Aug. 28, 2014) ("In light of the amendment addressing the
Fifth Circuit's precise concern, it seems clear that the Fifth Circuit now would find a hostile
work environment claim cognizable under USERRA."); *Wang v. N.Y. State Dept. of Health*, 40
Misc.3d 747, 753 (N.Y. 2013) ("While this subsequent amendment is not necessarily a reliable
indicator of Congress's original intent, the prompt legislative response to the *Carder* decision
does provide some measure of confirmation to the conclusion that USERRA provides for a
hostile work environment claim.").  The Court agrees with the other courts that have held that

---

[4] Even before the 2011 amendment, the First and Eleventh Circuits assumed without deciding
that USERRA provided a cognizable hostile work environment claim.  *See Vega-Colon v. Wyeth
Pharmaceuticals*, 625 F.3d 22, 32 (1st Cir. 2010); *Dees v. Hyundai Motor Mfg. Alabama, LLC*,
368 Fed. Appx. 49, 53 (11th Cir. 2010).

USERRA has provided for a hostile work environment claim, and thus, this claim in Count III will not be dismissed.[5]

## VI.    NEGLIGENCE

Count X charges defendant with negligent retention and supervision for failing to supervise or terminate Sergeant Nickerson for the harm he caused plaintiff.  "[A] common law claim of negligent supervision may be predicated only on common law causes of action or duties otherwise imposed by the common law. . . . To hold otherwise 'would be to impose liability on employers for failing to prevent a harm that is not a cognizable injury under the common law.'" *Griffin v. Acacia Life. Ins. Co.*, 925 A.2d 564, 576-77 (D.C. 2007) (quoting *Hays v. Patton-Tully Transp. Co.*, 844 F. Supp. 1221, 1223 (W.D. 1993)).   Although in his opposition plaintiff argues that "the underlying facts for this claim do not relate to the underlying facts for the Title VII discrimination/retaliation claim," he fails to provide any support for this assertion.  (Opp. at 28.) Plaintiff fails to show any evidence of independent tortious conduct distinct from the alleged harassment by Sergeant Nickerson, so this claim is preempted by Title VII.  *See Griffin*, 925 A.2d at 577; *Brown v. Children's Nat'l Med. Ctr.*, 773 F. Supp. 2d 125 (D.D.C 2011) ("Insofar as the conduct giving rise to plaintiff's negligence claims is the same conduct giving rise to her Title VII claims, the negligence claims appear to be duplicative."); *Wade v. WMATA*, No. 01-334, 2005 WL 1513137, at *6 (D.D.C. June 27, 2005) ("The precisely drawn, detailed Title VII preempts the more general common law negligence remedy.").

---

[5] In its motion for summary judgment, defendant does not otherwise challenge plaintiff's hostile work environment claim under USERRA.

**CONCLUSION**

For the foregoing reasons, the Court will grant defendant's motion for summary judgment with respect to Counts IV, VII, VIII, IX, X, and the discrimination claim in Count III and deny defendant's motion with respect to Counts I, II, VI, and the retaliation claim in Count III.  A separate Order accompanies this Memorandum Opinion.


/s/   *Ellen Segal Huvelle*
ELLEN SEGAL HUVELLE
United States District Judge


Date:   September 1, 2015